**Dismissed in Part, Affirmed in Part, and Majority and Dissenting Opinions filed July 18, 2019.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-17-00575-CV

---

**GRACIE NGUYEN; PATRICK SANCHEZ; TAMARA AND DERRICK O'NEAL, INDIVIDUALLY AND AS REPRESENTATIVES OF THE ESTATE OF DE' ANDRE TATUM, DECEASED; ERICA D. HALL; CURTISHA DAVIS; ARTHUR ZAMARRIPA, AS NEXT FRIEND OF A.Z.; AND WILLIAM JOSMA, Appellants**

V.

**SXSW HOLDINGS, INC.; SXSW LLC; PATRICK LOWE; TRANSPORTATION DESIGN CONSULTANTS; AND CITY OF AUSTIN, Appellees**

---

**On Appeal from the 261st District Court
Travis County, Texas
Trial Court Cause No. D-1-GN-17-002229**

---

## MAJORITY OPINION

South by Southwest is a music, film, and interactive festival held annually in downtown Austin. The festival is a major event, spanning ten days, occupying nearly

a hundred venues, and attracting hundreds of thousands of people. To accommodate the large numbers of pedestrians attending the festival, many downtown streets are barricaded and shut down to vehicular traffic.

On one night during the 2014 festival, the driver of a sedan maneuvered around a barricade and accelerated into a group of festivalgoers who had assembled in the street. The driver killed four people and injured many others.

Some of the injured parties and their survivors (collectively, the "Plaintiffs") filed this civil action, asserting various claims against the City of Austin and the organizers of the festival (collectively, the "Defendants"). The trial court disposed of the Plaintiffs' claims through a series of summary-judgment rulings in favor of the Defendants.

We vacate the portion of the trial court's judgment disposing of the claims against the City and dismiss those claims for want of jurisdiction, and we affirm the other portion of the trial court's judgment because the remaining Defendants had no duty to protect the Plaintiffs from the cause of their injuries, which was the driver's criminal act.

## I.     The Criminal Act

The driver in this case was a young man by the name of Rashad Owens. He had been drinking on the night in question, but his actions were not accidental or the result of driver error. Quite the opposite, when Owens sped into the crowd of pedestrians, he did so intentionally and knowingly because he was fleeing from police.

Before he struck the pedestrians, Owens cut off a police officer by making an illegal turn from Twelfth Street onto the southbound access road of Interstate 35. The officer activated his emergency lights in an attempt to initiate a traffic stop.

Owens signaled that he would pull over, and he eventually turned into a gas station at the corner of Ninth Street. But rather than park in an open spot at the gas station, Owens maneuvered around the fuel pumps and turned westbound onto Ninth Street, heading the wrong way down a one-way street.

Ninth Street was empty, and Owens accelerated on the open road. He then approached his first intersection at Red River Street, where many traffic control measures were in place because of nearby festival events. There were uniformed police officers. There were traffic cones and signs. And there were two types of barricades. The first type was an A-frame barricade, so named because its side supports are shaped like the letter "A." This barricade has a single horizontal board with reflective orange and white striping. The other type was a Type III barricade, so named because it has three horizontal boards (also reflective and striped) that are stacked along an upright stand and held in place by sandbags. Because of the stacking, a Type III barricade is much larger than an A-frame barricade.

The traffic control measures were different at each of the four points of the intersection. At the eastern point of the intersection (where Owens was driving the wrong way down Ninth Street), there were no barricades at all, but the southernmost lane of Ninth Street was cordoned off with traffic cones. Continuing in a clockwise direction, the crosswalk at the southern point of the intersection was lined with Type III barricades, which impeded Owens from turning left onto Red River. At the western point of the intersection, A-frame barricades blocked the outermost lanes of Ninth Street. A middle lane remained open, but a truck had stopped there, and it was facing eastbound (the correct direction), which impeded Owens from continuing westbound.

The northern point of the intersection along Red River had a large "Road Closed" sign, two Type III barricades, and an open "fire lane" on the far right-hand

side. The fire lane was reserved for emergency vehicles and for residents of an adjacent apartment complex, and it was blocked with just a traffic cone and a festival attendant who was screening for anyone trying to enter the apartment complex. The attendant saw Owens approaching the intersection and tried to wave Owens down. Rather than stop, Owens made a right turn into the fire lane, ran over the traffic cone, and forced the attendant to jump out of the way.

Owens then sped northbound along Red River, where pedestrians had gathered in the street. Owens hit the gas and barreled into the crowd at fifty-five miles per hour. He proceeded to the intersection of Red River and Tenth Street, where he crashed through a Type III barricade. He then continued on Red River and hit a bicycle, a motorcycle, and another vehicle. He eventually disabled his own vehicle near Eleventh Street, where he attempted to flee on foot, but he was quickly apprehended by police.

Owens was charged with capital murder and convicted of that offense in a trial by jury. On direct appeal, he argued that the evidence was legally insufficient to support his conviction, but the court of appeals rejected that argument and held that a reasonable factfinder could have concluded from the evidence presented that Owens had intentionally and knowingly caused the deaths of the people he hit with his vehicle. *See Owens v. State*, 549 S.W.3d 735, 742–43 (Tex. App.—Austin 2017, pet. ref'd).

## II.    The Civil Action

The Plaintiffs filed this civil action against the Defendants and sought to recover on various claims of negligence, premises liability, and public nuisance. Broadly speaking, the Plaintiffs alleged that the Defendants' barricades and other safety measures were inadequate to protect pedestrians during the festival. The Plaintiffs also asserted that the Defendants were liable for the resulting injuries

4

because it was foreseeable that an errant vehicle would penetrate the inadequate barricades and then collide with festivalgoers.

The Defendants moved for summary judgment on multiple grounds. In related motions that they all joined, the Defendants argued that they could not be liable because they owed no duty to protect the Plaintiffs from Owens's criminal conduct, and because the criminal conduct was a superseding cause of the Plaintiffs' injuries, which negated the element of proximate cause. In a separate motion, the City individually argued that it was shielded by governmental immunity and that the trial court lacked subject-matter jurisdiction.

The trial court ruled in a series of orders that each of the Defendants was entitled to summary judgment. The orders did not state the trial court's reasons. The trial court later merged the individual orders into a final take-nothing judgment, from which the Plaintiffs now appeal.

## III. The City's Motions

### A. The trial court implicitly rejected the City's jurisdictional challenge.

A recital in the final judgment states that the trial court granted the City's "Traditional and No-Evidence Motion for Summary Judgment." That recital is latently ambiguous because the City styled two motions with that exact same heading. One motion addressed the merits issues of duty and causation (which the remaining Defendants also addressed in their motions for summary judgment), and the other motion addressed the City's governmental immunity (in what could have been styled as a plea to the jurisdiction). The City filed the two motions on separate days, and the final judgment does not identify which of the two motions was actually granted.

The distinction is significant because the Plaintiffs only addressed the merits issues in their appellants' brief. They did not address the City's assertion of governmental immunity, apparently believing that the trial court had denied the City's plea to the jurisdiction.

Of course, if the trial court had granted the City's plea to the jurisdiction, then we would summarily affirm the portion of the judgment disposing of the claims against the City because the Plaintiffs failed to address the City's jurisdictional arguments in their appellants' brief. *See Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex. 1970) ("The judgment must stand, since it may have been based on a ground not specifically challenged by the plaintiff . . . ."). But the City asserts in its appellee's brief that the trial court "did not feel it was necessary to rule on the City's jurisdictional plea because, (1) summary judgment determinations resolved all of the Plaintiffs' claims against all of the Defendants equally; and (2) dismissal for lack of jurisdiction would have been redundant."

We cannot confirm the City's assertion because we do not have the benefit of a hearing transcript or any other sort of record regarding the trial court's reasoning. Nevertheless, the City's assertion is consistent with the language of the final judgment itself. Instead of "dismissing" the claims against the City, the trial court specifically ordered that the Plaintiffs "take nothing," which, as the City has said, indicates that the trial court ruled on the merits.

If a trial court has ruled on the merits in a case for which its subject-matter jurisdiction has been challenged, then the trial court has implicitly rejected the jurisdictional arguments. *See Thomas v. Long*, 207 S.W.3d 334, 339 (Tex. 2006). The effect of this rule is that the Plaintiffs were not required to address the City's jurisdictional arguments in their appellants' brief. However, because jurisdictional arguments can be raised at any time, the City would not be precluded from

reasserting its plea to the jurisdiction on appeal. *See Alfonso v. Skadden*, 251 S.W.3d 52, 55 (Tex. 2008) (per curiam). And the City has done that here in its appellee's brief.

Though a decision on the merits might be more economical in this particular case, we have a duty to determine questions of jurisdiction. *See In re City of Dallas*, 501 S.W.3d 71, 73 (Tex. 2016) (orig. proceeding) (per curiam). We therefore begin with the City's jurisdictional arguments. Our standard of review is de novo. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

## B.     The trial court should have granted the City's jurisdictional challenge.

When a municipality performs a governmental function, it acts as a branch of the state and shares in the state's sovereign immunity, although the municipality's immunity is known as "governmental immunity." *See Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 429–30 (Tex. 2016). Unless this governmental immunity is constitutionally or statutorily waived, a trial court lacks subject-matter jurisdiction over claims against the municipality. *See Suarez v. City of Texas City*, 468 S.W.3d 623, 631 (Tex. 2015).

Governmental functions are generally defined as those actions performed by a municipality that are "public in nature" and "in furtherance of general law for the interest of the public at large." *See City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770, 776 (Tex. 2006). Not every action performed by a municipality is performed as a governmental function. A municipality may perform proprietary functions, which are acts conducted by the municipality "in its private capacity, for the benefit only of those within its corporate limits, and not as an arm of the government." *See Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006). When

a municipality acts in a proprietary, non-governmental capacity, governmental immunity does not apply. *Id.*

In its plea to the jurisdiction, the City points out that the Plaintiffs have generally complained about the adequacy (or inadequacy) of police protection, barricades, traffic control plans, and the maintenance of traffic hazards. Because a municipality's actions in these matters are statutorily defined as governmental functions, the City contends that it retained its governmental immunity and that the trial court lacked subject-matter jurisdiction over the Plaintiffs' claims. *See* Tex. Civ. Prac. & Rem. Code § 101.0215(a)(1), (20), (30), (31) (identifying these matters in a nonexclusive list of governmental functions).

The Plaintiffs respond that the City was actually engaged in a proprietary function because it was "funding, maintaining, and operating" the festival alongside the remaining Defendants. This argument invokes the statutory authority that a municipality performs a proprietary function when it "own[s] and operate[s]" an "amusement." *Id.* § 101.0215(b)(2). Assuming for the sake of argument that the festival qualifies as an amusement, the Plaintiffs concede in a post-submission letter brief that "the City of Austin does not own SXSW." Therefore, we cannot conclude that the City engaged in a proprietary function on that basis.

The Plaintiffs also argue in their letter brief that the City engaged in a proprietary function because the City implemented its traffic control measures "only for the patrons of the festival, not the public at large." This argument also fails, because an action that is statutorily defined as a governmental function cannot also be a proprietary function. *Id.* § 101.0215(c).

Because the City demonstrated that it was performing a governmental function—and thus, that it was shielded by governmental immunity—the Plaintiffs were required to plead a valid waiver of that immunity. The Plaintiffs' pleadings do

8

not clearly articulate this waiver. To be sure, the pleadings contain passing references to the Tort Claims Act, which provides for such a waiver. For example, Section 101.021 provides that a governmental unit may be liable for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit, were it a private person, be liable to the claimant according to Texas law." *Id.* § 101.021(2). But the Plaintiffs did not expressly invoke this provision, and mere references to the Tort Claims Act are not sufficient by themselves to confer jurisdiction on the trial court. *See Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001).

The Plaintiffs alleged that the City "did not have the requisite barriers set up, nor did it ensure that the public who were present in the area were safe from negligently operated motor vehicles." They also alleged that the City "failed to utilize adequate traffic control measures to protect attendees who were pedestrians or bicyclists." They criticized the City for not installing more rigid, water-filled barriers, which presumably are more effective at stopping errant vehicles.

The City contends that even if the Plaintiffs' allegations could be proper under Section 101.021, they would still be insufficient to confer jurisdiction because each of the allegations is based on the City's exercise of its discretionary powers, and the Tort Claims Act does not apply to such claims. *See* Tex. Civ. Prac. & Rem. Code § 101.056 (providing that there is no waiver of immunity for a claim based on the failure of a governmental unit to perform an act that is not required by law, or on the decision not to perform an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit).

The Plaintiffs respond that the discretionary-power exemption does not apply in this case because the pleadings complain about the City's operational decisions, rather than its policy decisions. As their sole authority for this point, the Plaintiffs

rely on *Simons v. City of Austin*, 921 S.W.2d 524 (Tex. App.—Austin 1996, writ denied). That case is inapposite because it had nothing to do with the installation of traffic control measures, which courts have routinely recognized as involving the exercise of a governmental unit's discretionary powers. *See, e.g.*, *Tex. Dep't of Transp. v. Ramirez*, 74 S.W.3d 864, 867 (Tex. 2002) (per curiam) ("Likewise, decisions about installing safety features are discretionary decisions for which the State may not be sued."); *State v. Miguel*, 2 S.W.3d 249, 251 (Tex. 1999) (per curiam) ("Thus, the decision to use barrels and signs, as opposed to another warning device, was discretionary."); *Wenzel v. City of New Braunfels*, 852 S.W.2d 97, 100 (Tex. App.—Austin 1993, no writ) ("We hold that the City's decision whether to regulate traffic near the County Fair by the means suggested in the Wenzel's petition was discretionary.").

We generally allow a litigant an opportunity to cure her pleading defects when the pleadings do not allege enough jurisdictional facts. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). But this is not a case of pleading defects. Here, the pleadings and the evidence affirmatively show that the Plaintiffs' factual complaints concern discretionary decisions for which the City retains immunity from suit. *See* Tex. Civ. Prac. & Rem. Code § 101.056. The pleaded facts and the evidence thus demonstrate that it is impossible for the Plaintiffs to amend their pleadings to invoke jurisdiction. *See Ramirez*, 74 S.W.3d at 867–68.

Based on the foregoing, we conclude that the City retained its governmental immunity, which meant that the trial court should have dismissed the Plaintiffs' claims against the City for want of jurisdiction.

The next question for us to decide is whether the trial court correctly ruled on the remaining Defendants' motions for summary judgment.

## IV. The Remaining Defendants' Motions

To prevail on a traditional motion for summary judgment, the movant must show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *M.D. Anderson Hosp. & Tumor Ins. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam). When, as here, the movant is a defendant, summary judgment is proper only if the defendant conclusively negates at least one essential element of each of the plaintiff's theories of recovery, or if the defendant conclusively establishes each element of an affirmative defense. *See Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

In one of their grounds for summary judgment, the Defendants sought to negate the element of duty, which is a common element to all of the Plaintiffs' negligence claims. *See Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). That element is also essential to the Plaintiffs' premises claim, which is just "a special form of negligence." *See W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). And because the Plaintiffs pleaded that their nuisance claim arose out of the "Defendants' negligence in deploying inadequate traffic control measures," duty is an essential element of that claim as well. *See Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 607 (Tex. 2016). Thus, if the Defendants conclusively negated the existence of a duty, and the Plaintiffs failed to raise a fact question on duty, then the trial court's summary judgment must be upheld.

The Defendants argued in their motions that they could not be liable on the Plaintiffs' claims because the claims arose out of a criminal act, and generally speaking, a person has no duty to protect another from the criminal acts of a third party. This latter point bears some elaboration.

The no-duty rule is firmly established in our precedent, but it is not absolute. *See Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996). A person who controls a premises has a duty to use ordinary care to protect an invitee from the criminal acts of a third party if the person knows or has to reason to know of an unreasonable and unforeseeable risk of harm to the invitee. *See Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 53 (Tex. 1997). Whether this duty exists is a question of law for the court to decide based on the facts surrounding the occurrence in question. *See Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). That analysis typically begins with the threshold inquiry of foreseeability. *See UDR Tex. Props., L.P. v. Petrie*, 517 S.W.3d 98, 101 (Tex. 2017).

Our case law has developed two frameworks for establishing foreseeability. The first framework is set forth in *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749 (Tex. 1998), which holds that a duty arises when "the general danger" is foreseeable, "not the exact sequence of events that produced the harm." *Id.* at 756. When the general danger is the risk of harm from criminal activity, foreseeability must be proven with evidence of "specific previous crimes on or near the premises." *Id.*

The second framework is set forth in *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762 (Tex. 2010), which holds that when the premises occupier lacks knowledge of specific previous crimes, a duty may still arise if the occupier has "actual and direct knowledge" of "imminent" criminal conduct. *Id.* at 769. Foreseeability is proven in this scenario by considering "the nature and character of the premises," as well as the "immediately preceding conduct." *Id.* at 768–69.

Criminal conduct is often unforeseeable, but for a defendant to negate foreseeability (and therefore the existence of a duty), the defendant must establish more than just the occurrence of criminal conduct. *See Phan Son Van v. Pena*, 990

12

S.W.2d 751, 754 (Tex. 1999). The defendant must also show that the criminal conduct was not foreseeable because it was an intervening force that rose to the level of a superseding cause. *Id.* The factors to consider in that analysis include: (1) whether the intervening force brought about a harm that was different in kind from that which would otherwise have resulted from the defendant's act or omission; (2) whether the intervening force's operation or the consequences thereof appeared after the event to be extraordinary rather than normal in view of the circumstances existing at the time of the force's operation; and (3) whether the intervening force was operating independently of any situation created by the defendant's act or omission, or, on the other hand, whether it was a normal result of such a situation. *Id.*

Based on these legal principles, the Defendants could negate the existence of a duty by conclusively establishing that the Plaintiffs' injuries arose from criminal conduct and that the criminal conduct was not foreseeable. *Id.* If the Defendants satisfied this initial summary-judgment burden, then the burden would shift to the Plaintiffs to raise a fact question, either by showing with some evidence that there was no criminal conduct, or by showing that the criminal conduct was foreseeable under *Timberwalk* or *Del Lago*. *Id.* When deciding whether the parties have met these respective burdens, we apply a de novo standard of review, and we consider all of the evidence in the light most favorable to the Plaintiffs, because they are the nonmovants. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

Among their summary-judgment proof, the Defendants relied on certain witness testimony from Owens's capital-murder trial, the charge of the court in that criminal case, and the resulting judgment of conviction. This evidence conclusively

13

established that the Plaintiffs' injuries arose from criminal conduct. *See Phan Son Van*, 990 S.W.2d at 753 (addressing similar summary-judgment proof).

The Defendants also relied on the affidavit testimony of Patrick Lowe, who is one of the named Defendants. Lowe worked for the City as a traffic and engineering technician for over twenty years. He then started an independent consulting business, which helped in planning for the festival every year since 2009. Lowe testified that, outside of Owens's criminal conduct, he had "never heard of an incident of a vehicle driving through or bypassing street-closure barricades and injuring or killing a pedestrian or cyclist on the other side during a SXSW festival event." He similarly testified that he was "not aware of any injury to any person inside the enclosure area at a SXSW event caused by any type of motor vehicle under any circumstances." When combined with the evidence showing that Owens was acting independently, Lowe's testimony established that the criminal conduct was an intervening force that was both extraordinary and unforeseeable. *Id.* at 754.

Based on the foregoing, we conclude that the Defendants satisfied their initial summary-judgment burden of showing that they did not have a duty to protect the Plaintiffs from the cause of their injuries, which was an unforeseeable criminal act. The burden accordingly shifted to the Plaintiffs to raise a genuine issue of material fact.

## V.    The Plaintiffs' Response

The Plaintiffs did not dispute that Owens had engaged in criminal conduct. But in a lengthy response, they did argue that his conduct was foreseeable under both *Timberwalk* and *Del Lago*. We examine each of their arguments in turn.

14

## A. *Timberwalk* Analysis

To show that Owens's criminal conduct was foreseeable under *Timberwalk*, the Plaintiffs were required to produce some evidence of "specific previous crimes." *See Timberwalk*, 972 S.W.2d at 756. The Plaintiffs sought to satisfy that burden with evidence of twenty-three criminal occurrences, which were documented in a collection of police reports and news articles. We summarize the occurrences below, addressing them in the same order as they appeared in the Plaintiffs' summary-judgment response.

### i. The Twenty-Three Occurrences

*Occurrences In or Near Downtown Austin During the Festival*

1.    March 19, 2010—A driver went the wrong way down a one-way street at an unsafe speed. An officer on foot yelled at the driver to stop, but the driver accelerated away. The driver made a quick U-turn to avoid oncoming traffic and side-swiped a parked car. The driver resumed driving in the proper direction, and passed the officer again, who opined that the driver was intoxicated. The officer entered his patrol car and pursued the driver with his emergency lights and siren engaged. The driver evaded the officer and turned the wrong way onto another one-way street. The driver side-swiped another vehicle and continued to an intersection, where multiple pedestrians were crossing the street in a designated crosswalk. The pedestrians ran to get out of the way, and the driver swerved to the curb. The driver hit one pedestrian on the sidewalk and did not stop to render aid. The pedestrian's injuries were serious, but not life-threatening.

2.    March 16, 2013—Multiple pedestrians were crossing the street at a designated crosswalk. A driver seeking to turn inched his way towards the crosswalk and then accelerated after perceiving an opening in the crowd. The driver hit one of

the pedestrians on the pedestrian's side, causing the pedestrian to spin around. The pedestrian's injuries were not life-threatening.

3.     March 15, 2013—A driver collided with a taxi in an intersection, but the driver did not stop to render aid. Around the same time as that taxi collision, police received a call about a nearby collision between a pedestrian and a vehicle that matched the description of the one that had hit the taxi. Police investigated the scene described in the call, but no injured pedestrian was ever located.

4.     March 15, 2013—While stopped at an intersection, a driver argued with a bicyclist about being in a lane of traffic. The driver turned his vehicle into the bicyclist's lane, ran over the bicyclist's front tire, and knocked the bicyclist to the ground. The driver sped away and was never found. The bicyclist suffered minor injuries and refused to be transported to the hospital.

5.     March 11, 2014—A driver collided with a motorcyclist and knocked the motorcyclist off of his motorcycle. The driver sped away and was never found. The motorcyclist suffered minor injuries and refused to be transported to the hospital.

6.     March 11, 2014—A driver was stopped at a red light. When the light turned green, a pedestrian entered the crosswalk against the pedestrian control device, and the driver ran over the pedestrian's foot at a slow speed. The driver paused for a moment, apparently realizing that the pedestrian had been struck, but then sped off without checking on the pedestrian. The driver was never found. The pedestrian's injuries were not life-threatening.

7.     March 17, 2013—A driver changed lanes in heavy traffic and struck a pedicab operator with his side mirror. The driver stopped and was determined to have been intoxicated. No one was injured.

16

8.      March 20, 2011—A driver rear-ended a bicyclist. The driver stopped his vehicle, gave a fake name and phone number to the bicyclist, then drove away when the bicyclist called police. The driver was later caught. The bicyclist complained of lower back pain, but did not seek medical attention.

9.      March 17, 2010—A driver rear-ended a bicyclist. The driver did not stop to render aid and was never found. The bicyclist suffered minor injuries.

*Occurrences In or Near Downtown Austin, But Not During the Festival*

10.      April 17, 2011—The City shuts down a portion of Sixth Street on certain days of the week when crowds and drinking are at their heaviest. One vehicle managed to park along Sixth Street before the street closure was implemented. Later that evening, as the bars were closing and as pedestrians were filling the street, the driver of the parked vehicle tried to leave. One passenger in the vehicle told the driver to wait until the crowd thinned out, but the driver said "Fuck them!" and drove into the crowd at a speed estimated to be between eighteen and thirty miles per hour. Pedestrians jumped out of the way, and at least two were knocked down. As the driver forced her way through the crowd, one of her passengers leaned out the window and punched people on the street. Police stopped the driver at a nearby intersection, and arrested the driver and her passenger. The pedestrians who had been knocked to the ground left the scene before police could contact them. The pedestrians never came forward seeking to press criminal charges.

11.      October 2012—A driver hit three pedestrians with her car when she was trying to leave Sixth Street after the bars had closed. The driver said that she was only trying to escape a drunken mob, which was attacking her. No information was provided as to the extent of the pedestrians' injuries.

12.     May 7, 2012—A driver traveling at a high rate of speed lost control of his vehicle and veered onto a hike and bike trail, where he hit two pedestrians. The driver stopped his vehicle and tried to walk away, but onlookers made him return. The driver initially claimed that a third party had been operating the vehicle, but then the driver confessed that he had fallen asleep at the wheel. One of the pedestrians died, and the other suffered serious bodily injuries.

13.     October 19, 2013—A driver attempting to turn left at an intersection failed to yield to oncoming traffic and collided with a moped. The driver stopped and revealed that he had been drinking. The moped operator's injuries were not life-threatening.

14.     May 6, 2012—A driver traveling on the access road of Interstate 35 hit an intoxicated pedestrian who had run into the street. The driver paused for a moment, but then fled the scene and was never located. The pedestrian's injuries were not life-threatening.

15.     December 14, 2011—A drunk driver rear-ended a taxi. The driver remained at the scene. No pedestrians were involved.

16.     February 5, 2011—A driver fled the scene after hitting a pedestrian. The driver was never caught. The pedestrian's injuries were not life-threatening.

17.     December 21, 2011—A pedestrian who was lawfully crossing the street was struck by a driver who was attempting to make a turn. The driver paused after the collision and then sped away. The driver was never caught. The pedestrian did not complain of any pain at the scene of the collision, but he was later determined to have suffered internal head injuries that were life-threatening. The pedestrian survived.

18

18. January 31, 2010—A driver rear-ended another vehicle and fled the scene. The driver was stopped shortly thereafter and determined to be intoxicated. No pedestrians were involved.

19. April 24, 2010—A motorcyclist navigated around a barricade on Sixth Street in order to find a parking spot close to a bar. A police officer witnessed the barricade violation and instructed the motorcyclist to leave. The motorcyclist went around the block and was spotted again on his motorcycle within the barricaded area. When the officer approached the motorcyclist and demanded to see his driver's license, the motorcyclist sped off. The motorcyclist was never caught. No pedestrians were involved.

*Out-of-State Occurrences*

20. July 17, 2011—At a music festival in Virginia, a truck rolled down a hill, out of control, and ran over three pedestrians in a campground. One of the pedestrians died, and the other two were seriously injured. No charges were filed against the driver of the truck, but an investigation was ongoing.

21. July 16, 2003—At a farmer's market in California, a driver accelerated into a group of pedestrians, killing ten and injuring sixty-three. The driver, who was elderly, explained that his acceleration had been unintentional.

22. August 3, 2013—At a boardwalk in California, a driver jumped a curb, maneuvered past barricades, and plowed into a group of pedestrians, killing one and injuring seventeen others. The driver was allegedly angry because of a botched drug deal, and he sought to run over the drug dealer.

23. July 2006—At a regatta in Indiana, a driver accelerated into a crowd of spectators, injuring eight, three of them seriously. The driver was intoxicated on chemical inhalants.

### ii.  The *Timberwalk* Factors

We must weigh these twenty-three occurrences against five factors to determine whether the risk of Owens's criminal conduct was foreseeable. *Id.* at 757.

The first factor is proximity. *Id.* For the premises occupier to foresee criminal conduct on the property, the other crimes must have occurred "on the property or in its immediate vicinity." *Id.* Criminal activity occurring farther away from the property bears less relevance because crime rates may be expected to vary significantly within a large geographic area. *Id.*

The second and third factors are usually considered together. *Id.* at 757–58. They are recency and frequency. *Id.* The occurrence of a significant number of crimes within a short time period strengthens the claim that the particular crime at issue was foreseeable, whereas the complete absence of previous crimes, or the occurrence of a few crimes over an extended time period, negates the foreseeability element. *Id.* at 758.

The fourth factor is similarity. *Id.* The previous crimes must be sufficiently similar to the crime in question so as to place the premises occupier on notice of the specific danger. *Id.* The prior crimes need not be identical. *Id.*

The fifth factor is publicity, which helps determine whether a premises occupier knew or should have known of a foreseeable danger. *Id.* Actual notice of past incidents strengthens the claim that future crime was foreseeable, whereas unreported criminal activity on the premises is no evidence of foreseeability. *Id.* at 758–59. Premises occupiers bear no duty to regularly inspect criminal records to determine the risk of crime in the area, but when the occurrence of criminal activity is widely publicized, occupiers can be expected to have knowledge of such crimes. *Id.* at 759.

### iii.    Application of Factors to Evidence

We begin our analysis with the four out-of-state occurrences, which were so far removed spatially as to be irrelevant under the proximity factor. Occurrence 21 received national news coverage, garnering the widest publicity of them all, but it was temporally remote, having happened more than ten years earlier. *Id.* at 758 n.40 (implicitly equating a "short time period" to a span under four years). Occurrence 23 was also remote, and does not appear to have received any publicity outside of its geographic area. None of the occurrences had any sort of factual similarity to Owens's criminal conduct, except for Occurrence 22, but that occurrence did not happen during a festival or during a police pursuit, and there is no indication that the Defendants were aware of it (or, because of its extreme distance, should have been aware of it). Altogether, these occurrences fail to raise a fact issue that Owens's criminal conduct was foreseeable.

As for the remaining occurrences that were either in or near downtown Austin, only Occurrence 15 happened on the same block as Owens's criminal conduct, but that occurrence did not happen when barricades were in place, and it bore no factual similarities to what Owens did. Also, the Defendants were not occupying the premises at the time of the occurrence, and the Plaintiffs produced no evidence that the occurrence was actually publicized or that the Defendants knew or should have known about it.

The other occurrences mostly happened within one-half mile of Owens's criminal conduct, in the heart of Austin's downtown nightlife. But with limited exceptions, the facts of those occurrences were unremarkable and bore very little resemblance to what happened in this case. Only a small number of the occurrences shared some of the more salient facts of Owens's criminal conduct, but even those similarities were few and far between.

21

For example, Occurrence 19 was the only example where a motorist, like Owens, intentionally penetrated a barricade. But the culpable party there was a motorcyclist, not the driver of a sedan, and the motorcyclist navigated around the barricade for the purpose of finding a parking spot, not because he was actively fleeing from police at highway speeds. Although the motorcyclist would later speed off after an officer approached him, no pedestrians were ever impacted by the motorcyclist's conduct. And because the motorcyclist was never found, the occurrence did not result in criminal charges, and there is no indication that the Defendants were ever made aware of it.

Occurrence 12 was the only example that involved a fatal auto-pedestrian collision. But that occurrence happened during daytime hours, more than a mile away from where the Plaintiffs were injured. And though this occurrence received local publicity, it did not happen during the festival or involve any sort of barricades or evasion from police.

Occurrence 10 was the only example that involved a driver intentionally hitting pedestrians within a barricaded area. But unlike Owens, the driver there did not intentionally penetrate the barricade. The barricade was installed after the driver had parked. Also, the driver traveled at significantly slower speeds than Owens, no injured pedestrians were ever identified or came forward to press charges, and there was no evidence of any publicity.

Finally, Occurrence 1 was the only example of an auto-pedestrian collision that happened during a police pursuit. But that occurrence was not very recent, happening nearly four years before Owens's criminal conduct. And there was no evidence that the driver penetrated a barricade, or that the occurrence received any sort of publicity.

Owens's criminal conduct was extraordinary, both in its manner and its severity, and it was unlike any of the cited occurrences that previously happened in or near downtown Austin. Those previous occurrences were not sufficiently similar to put the Defendants on notice of the danger that a driver might navigate around a barricade and then barrel down a closed street into a crowd of pedestrians at highway speeds. *Cf. Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 17 (Tex. 2008) (concluding that a history of robberies on the premises of a shopping center was not sufficient to show that a murder was foreseeable, where no murder had occurred there previously). Accordingly, we conclude that the occurrences did not raise a genuine issue of material fact as to the foreseeability of what Owens did in this case.

### iv. Other Points

Aside from the twenty-three occurrences described above, the Plaintiffs also relied on certain statistical data to show that Owens's criminal conduct was foreseeable. The data identified over 150 auto-pedestrian collisions across Austin in the six years before Owens's criminal conduct. The data also identified thousands of instances of drunk driving.

Abstract statistics may be useful for establishing the recency and frequency of crime, but they do not provide much, if any, insight as to the other *Timberwalk* factors. Thus, we conclude that the Plaintiffs' statistical evidence is insufficient to avoid a summary judgment. *See Smit v. SXSW Holdings, Inc.*, 903 F.3d 522, 532 (5th Cir. 2018) (reaching the same conclusion in a parallel case that was filed in federal court).

The Plaintiffs also argued in their summary-judgment response that a duty analysis under *Timberwalk* was unnecessary, at least on their claim of negligence per se, because the evidence conclusively established that the Defendants had

23

violated certain traffic control laws. The Plaintiffs then referred to *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546 (Tex. 1985), which recognized that "the unexcused violation of a statute or ordinance constitutes negligence as a matter of law if such statute or ordinance was designed to prevent injury to the class of persons to which the injured party belongs." *Id.* at 549.

The Defendants addressed this point in their motion for summary judgment. They explained that even if they had been negligent (which they disputed), they could not be liable unless their negligence was the proximate cause of the Plaintiffs' injuries. The Defendants then argued that they negated the element of proximate cause because they conclusively established that Owens's criminal conduct was the sole, superseding cause of the Plaintiffs' injuries, and the Plaintiffs could not show that Owens's criminal conduct was foreseeable. We agree with this analysis.

"The 'foreseeability' analysis is the same for both duty and proximate cause." *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 659 (Tex. 1999) (plurality op.). The Defendants conclusively established that Owens's criminal conduct was a superseding cause, and in their response, the Plaintiffs presented no evidence showing that the superseding cause was foreseeable.

## B.    *Del Lago* Analysis

To show that Owens's criminal conduct was foreseeable under *Del Lago*, the Plaintiffs were required to produce some evidence that the Defendants had "actual and direct knowledge" that the criminal conduct was "imminent." *See Del Lago*, 307 S.W.3d at 769. The Plaintiffs sought to satisfy that burden with evidence of the Defendants' pre-festival discussions, where the Defendants recognized that safety was a serious issue that should be prioritized. The Plaintiffs also relied on evidence regarding the nature and character of the festival itself, which showed that the

24

festival draws "massive crowding" into the streets, and that the overcrowding can become problematic with the rise of "alcohol tourism."

None of this evidence addressed what the Defendants actually and directly knew in the moments "immediately preceding" Owens's criminal conduct. *Id.* (considering what the premises owner knew in the ninety minutes before a melee broke out). Because the Plaintiffs produced no evidence that Owens's criminal conduct was "imminent," the Plaintiffs failed to raise a fact issue regarding foreseeability under *Del Lago*. *See Smit*, 903 F.3d at 531 n.6 (rejecting an argument that foreseeability under *Del Lago* can be established without evidence regarding the imminence of the criminal conduct).

## VI. Evidentiary Rulings

The Plaintiffs raise an appellate complaint about the trial court's exclusion of six exhibits to their summary-judgment response.

Five of the exhibits were news articles relating to specific previous crimes, which we fully referenced above in our summaries of Occurrences 11, 12, 20, 22, and 23. For the sake of argument, we can assume without deciding that the trial court abused its discretion by excluding the exhibits. However, because we have already determined that the five cited occurrences did not create a fact issue on foreseeability, we conclude that any error in the exclusion of the exhibits did not lead to the rendition of an improper judgment. *See* Tex. R. App. P. 44.1.

The sixth exhibit was a crude report that studied certain issues along Sixth Street and that the Defendants received several months before the festival at issue. The Plaintiffs argue that this report should have been admitted because it demonstrated that the Defendants were given "notice of problems related to alcohol and crowd control in the Austin business district." Again, even if we assumed for

the sake of argument that the trial court abused its discretion by excluding this exhibit, we would have to conclude that the trial court's error was harmless because the report in no way establishes that Owens's criminal conduct was foreseeable.

## VII. Sanctions

The Defendants allege that the Plaintiffs misrepresented certain facts both in the trial court and in their briefing on appeal. The alleged misrepresentations touched on such descriptions as the City's traffic control plan, the emergency closure area, and the delineation of the fire lane. The Defendants request that we exercise our inherent authority to impose sanctions against Plaintiffs' counsel, who was given an opportunity to cure the alleged misrepresentations but never filed an amended brief.

Granting sanctions is discretionary, and we must exercise that discretion "with prudence, caution, and after careful deliberation." *See Baker Hughes Oilfield Operations, Inc. v. Hennig Prod. Co.*, 164 S.W.3d 438, 448 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Applying that standard, we do not believe that this case raises some of the "truly egregious" circumstances for which sanctions should be reserved. *Id.* The Plaintiffs' counsel filed a post-submission letter identifying where his representations were supported by the record. And as the Defendants themselves recognize, even if the Plaintiffs' factual representations were false, they would not change the analysis on the dispositive issues in this appeal. We therefore deny the request for sanctions.

## VIII. Conclusion

The portion of the trial court's judgment disposing of the claims against the City is vacated and those claims are dismissed for want of jurisdiction, and the remaining portion of the trial court's take-nothing judgment in favor of the other Defendants is affirmed.

/s/    Tracy Christopher
Justice


Panel consists of Justices Christopher, Zimmerer, and Hassan. (Hassan, J., dissenting).